DS1330005



CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2022 MAY -3 AM 10: 45

DEPUTY CLERK___MS

**IN THE UNITED STATES DISTRICT COURT**

**FOR NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **PLAINTIFF** | ) | |
| | ) | |
| **ALEX MADRID** | ) | **3 -22CV0982 -D** |
| | ) | |
| **V.** | ) | NO. _____ |
| | ) | |
| **NAME OF DEFENDANTS** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |

### Plaintiff's Original Complaint

#### I. Introduction

1. Plaintiff, Alex Madrid (hereinafter "Plaintiff" or "Mr. Madrid"), brings this action on his own behalf, having suffered through the callous and cruel effects of the substandard care, care that fell well below the accepted standard of care for such medical professionals, at Dallas Veterans Affairs Medical Center (hereinafter "Dallas VAMC") and by its staff and employees. Federal Tort Claims Act, 28 U.S.C.A 1346(b).

2. From November 5, 2015, through November 29, 2021, Dallas VAMC was plaintiff's primary cardiologist providers and negligently failed to inform, examine, diagnose, or treat significant abnormalities of numerous test results. 38 CFR 17.32(a), 38 CFR 17.32(b)(1), 38 CFR 17.33(a)(2), VA Directive 1088(2)(a), VA Handbook 1004.1(5)(13)(a)(1).

3. These test results include: (3) Right heart catherizations (hereinafter "RHC) and (6) radiology reports.

Original Complaint- Alex Madrid vs United States of America Negligence and Substandard of Care at Dallas Veterans Affair Medical Center 2017-2021.

1

4. Dallas VAMC negligently failed to use a known and widely accepted mapping system or obtain any imaging prior to the ablation procedure performed at Dallas VAMC February 28, 2017. The negligent acts devastatingly caused severe and total stenosis in Mr. Madrid's pulmonary veins (hereinafter "PVS"). PVS is a known but rare disease and stents had to be placed in 3 of 4 of plaintiff's pulmonary veins (hereinafter "PVs").

5. Dallas VAMC negligently failed to give prompt and appropriate treatment, to known abnormalities and diseases, in an acceptable time allowing abnormal findings to fabricate into two terminal diseases and life-threatening hemoptysis.

## II. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under the Constitution and laws of the United States. This Court has jurisdiction to grant relief in this action pursuant to 28 U.S.C. § 1346(b), as Plaintiff brings claims under the Federal Tort Claims Act.

7. Venue is proper in the Northern District of Texas, Dallas Division, under 28 U.S.C. § 1402(b) because the events giving rise to these claims occurred in this judicial district at Dallas VAMC.

## III. PARTIES

8. Plaintiff is Alex Madrid, a natural person residing in Johnson County, Texas in the United States.

9. Defendant is the United States of America, the sovereign nation responsible for the enforcement of laws through officers, agents, and employees of the Department of Veterans Affairs and its component agencies.

2

Original Complaint- Alex Madrid vs United States of America Negligence and Substandard of Care at Dallas Veterans Affair Medical Center 2017-2021.

## IV. STATUTE OF LIMITATIONS

10. Date of negligence began on February 28, 2017, with an ablation for atrial fibrillation, which continues to be monitored and treated.

11. Plaintiff has received seven additional ongoing cardiopulmonary procedures for secondary conditions of the ablation at Dallas VAMC, with the most recent being April 7, 2021.

12. Pulmonary hypertension was suspected on December 21, 2020, and verified at UT Southwestern Medical Center (hereinafter "UTSW") with a right heart catheterization in January 12, 2021.

13. Pulmonary fibrosis was suspected on December 21, 2020, and verified at UTSW with a lobectomy, removal, of the upper lobe of the left lung on April 07, 2021.

## V. ADMINISTRATIVE REMEDIES

14. This suit is timely filed under the FTCA, 28 U.S.C. § 2401(b), as it is being filed more than 6 months with no response or no resolution, 28 U.S. C. § 2675(a).

15. Plaintiff timely filed an administrative complaint with the Department of Veterans Affairs, via an SF-95, on or about May 11, 2021, after terminal diseases were suspected and verified to be caused by original ablation procedure on February 28, 2017.

16. Correspondence in the form of a letter, dated May 27, 2021; Veterans Affairs Torts Law Group recognized that they received the plaintiff's submission of his administrative complaint.

## VI. TIMELINE OF EVENTS

17. October 29, 2015, while driving, plaintiff suffered an ischemic stroke and was taken

3

Original Complaint- Alex Madrid vs United States of America Negligence and Substandard of Care at Dallas Veterans Affair Medical Center 2017-2021.

to Harris Methodist emergency room in downtown Fort Worth.

18. November 3, 2015, plaintiff received an ablation for atrial flutter by Dr. Kenneth McBride at Harris Methodist Fort Worth. Dallas VAMC was made aware of the admission and approved of the procedure and facility.

19. February 28, 2017, plaintiff received a radiofrequency ablation and pulmonary vein isolation for Atrial Fibrillation at Dallas VAMC by Dr. Phi Wiegn.

20. June 11, 2017, a nursing encounter telephone note was entered in plaintiff's medical records stating Felicia Johnson, staff nurse, had called plaintiff and informed him that his discharge diagnosis, from ER, was "pulmonary hypertension" and that a "treatment plan was discussed". Plaintiff has no recollection of being informed he had a terminal disease and there is no treatment plan or follow-up.

21. August 10, 2017, two stents were placed in plaintiff's lower two pulmonary veins as Mr. Madrid was symptomatic with pulmonary vein stenosis, secondary to the ablation procedure on February 28, 2017. Dallas VAMC performed an angiography, Echo, and RHC.

22. During this procedure Dr. Houman Khalili was unable to break through the 100% stenosed left superior pulmonary vein and "considered" to do it at another time, as shown in procedural notes.

23. December 22, 2017, a stent was finally placed in Mr. Madrid's left superior PV at Dallas VAMC by Dr. Houman Khalili. 6 months had passed with a known 100% totally stenosed upper left PV.

24. April 25, 2019, Dallas VAMC sent plaintiff, via "Community Care", to UT Southwestern Dallas (hereinafter "UTSW") for an angioplasty to clear the total occlusion of the

4

Original Complaint- Alex Madrid vs United States of America Negligence and Substandard of Care at Dallas Veterans Affair Medical Center 2017-2021.

left superior PV and moderate occlusion of the left inferior PV as they were occluded with scar tissue. An Echo and RHC were performed as well. Dallas VAMC have all pertaining medical records of this procedure.

25. October 25, 2019, a cardiology note by fellow Anna Rosenblatt, states, "will consider repeat right heart catherization and pulmonary vein angiography pending results… Patient could be developing a component of pulmonary hypertension with chronically elevated post capillary pressures".

26. January 03, 2021, Dr. Michael Luna of UTSW, performed and angioplasty to clear a total occlusion of left superior and left inferior PVs. Mr. Madrid chose to pay for this procedure at UTSW because he felt better taken care of and safer with their invasive procedure etiquette. Dallas VAMC continued to be plaintiff's cardiologist, provide medication, perform imaging, and perform follow-ups.

27. June 26, 2020, Dr. Michael Luna of UTSW, performed an angiography and "stent in stent" placement of the left superior PV stent. Dr. Michael Luna stated that the original stent placed was too small. This is the stent that had a history of chronically being occluded.

28. November 3, 2020, Mr. Madrid went to the Texas Health South Emergency Room because he was bleeding from his mouth. Dr. Michael Luna was informed and informed plaintiff to stop taking 1 of the 2 blood thinners that he was prescribed. Further it was noted that the bleeding was likely due to the chronic procedures of the pulmonary veins.

29. November 18, 2020, Plaintiff had a pulmonary function test performed at Dallas VAMC because he was having a very hard time breathing and felt as if he was not healing as quickly as usual after the June 26, 2020, procedure. Dallas VAMC found minimal decrease in

Original Complaint- Alex Madrid vs United States of America Negligence and Substandard of Care at Dallas Veterans Affair Medical Center 2017-2021.

5

lung function, prescribed Mr. Madrid albuterol and scheduled no follow up or examinations.

30. December 21, 2020, Mr. Madrid still felt like he could not breath and scheduled a visit with Dr. Muhanned Abu-Hijleh, pulmonologist at UTSW, and he performed an examination, conducted a six-minute walk test, pulmonary function test and radiology imaging. In the manner of 8 days, it was suspected that Mr. Madrid to pulmonary fibrosis and pulmonary hypertension due to chronic occlusion of the upper left pulmonary veins.

31. January 12, 2021, Dr. Michael Luna UTSW, performed a perfusion test of Mr. Madrid's lungs and performed a RHC, which verified pulmonary hypertension and verified it was due to chronic total occlusion of the superior left PV.

32. April 07, 2021, Mr. Madrid underwent a lobectomy by Dr. Kemp Kernstein at UTSW, in which his upper lobe of the left lung was removed from his body. The lobectomy was a rushed decision because plaintiff began to bleed heavily from the mouth and told he had life threatening hemoptysis. Pulmonary fibrosis was confirmed with the severe scarring throughout the left upper lobe of his lung, and it was stated in records that it was due to the chronic total occlusion of the left upper pulmonary vein.

33. October 13, 2021, the veterans' affairs responded to plaintiff with a veteran's benefits administration award. The following decision was: "Service connection for pulmonary fibrosis with pulmonary vein stenosis, status post ablation and stents, with pulmonary hypertension (also claimed as central large veins occlusive disease with blood clots and chronic left upper lobe dysfunction) is granted with an evaluation of 100 percent effective December 2, 2019. There was no financial benefit from this award as Mr. Madrid had met maximum compensation of Special Monthly Compensation R1, smc- (r)1, for other service-connected

6

disabilities.

34. The Department of Veterans Affairs has accepted responsibility for causing pulmonary vein stenosis, pulmonary hypertension, and pulmonary fibrosis due to the procedure they conducted on plaintiff on February 28, 2017.

## VII. STATEMENT OF FACTS

### Count 1

### Negligence- Procedural Errors of Ablation Procedure February 28, 2017.

35. The foregoing facts represent the professionally negligent actions of Dallas VAMC, Which actions proximately caused harm to Mr. Madrid.

36. Ablation procedure at Dallas VAMC, on February 28, 2017, was below substandard of care. Standard and widely accepted procedural techniques were not utilized or properly documented, 38 U.S.C. 17.33(2). Preprocedural imaging was not taken or utilized during the ablation procedure, 38 U.S.C. 17.33(2).

37. Mapping procedures of the heart were not utilized during the ablation procedure. These are well-known and improved techniques that significantly reduced the rate of post ablation PVS, 38 U.S.C. 17.33(2).

38. Proper Informed consent was not obtained as Mr. Madrid was not informed that there were prior imaging reports of abnormal findings of the lungs and that the procedure had well known risks of PVS. 38 U.S.C. 13.32(d)(1), VA Handbook 1004.1(5).

### Count 2

### Negligence- Delay in Treatment of Pulmonary Vein Stenosis

39. The foregoing facts represent the professionally negligent actions of Dallas VAMC,

Original Complaint- Alex Madrid vs United States of America
Negligence and Substandard of Care at Dallas Veterans Affair
Medical Center 2017-2021.

Which actions proximately caused harm to Mr. Madrid.

40. Dallas VAMC negligently failed to perform immediate post ablation imaging promptly following the ablation procedure on February 28, 2017; Mr. Madrid was a known multi ablation procedure recipient. Dallas VAMC only performed imaging to check for residuals or stenosis when plaintiff became symptomatic. Prompt imaging could have helped identify circulatory benefits or residual diseases immediately post ablation to check for stenosis of the pulmonary veins, 38 U.S.C. 17.33(2). Urgent intervention and timely care were not taken by Dallas VAMC to correct Plaintiff's PVS post ablation, 38 U.S.C. 17.33(2).

41. On July 6, 2017, there is a medical record note that mentions about plaintiff's complaint of shortness of breath.

42. CT scans, in July 2017, had significant findings, in which plaintiff was called report to the emergency room: however, stents for PVS were not placed until August 10, 2017, in the bilateral inferior PVs, 38 U.S.C. 17.33(2).

43. The completely stenosed left superior PV was not stented during the August 10, 2017, Procedure, 38 U.S.C. 17.33(2).

44. The interventional cardiologist mentioned, "will consider stenting of LSPV". The next CT scan was done on October 16, 2017, followed by stenting of the left superior PV on December 22, 2017, 4.5 months after imaging first verified PVS,38 U.S.C. 17.33(2).

## Count 3

### Negligence- Failure to Diagnose and Delay in Treatment for Pulmonary Hypertension

45. The foregoing facts represent the professionally negligent actions of Dallas VAMC,

8

Original Complaint- Alex Madrid vs United States of America Negligence and Substandard of Care at Dallas Veterans Affair Medical Center 2017-2021.

Which actions proximately caused harm to Mr. Madrid.

July 11, 2017, Plaintiff's medical records suggest that Mr. Madrid was made aware of a diagnosis of pulmonary hypertension and a treatment plan was explained and understood. Mr. Madrid has no recognition of this phone call or being diagnosed of a terminal disease.

46. A RHC is the only true way to diagnose pulmonary hypertension and the standard accepted test to verify the diagnosis. If plaintiff was informed that he had pulmonary hypertension a RHC must have been performed on the February 28, 2017, ablation procedure at Dallas VAMC. There are no such records or test results that can verify or explain the reason for this phone call and over the phone diagnosis. There is no formal diagnosis of pulmonary hypertension and follow-up treatment for pulmonary hypertension, 38 U.S.C. 17.33(2).

47. Right Heart Catherizations were performed on August 10, 2017, December 22, 2017, and April 25, 2017. These test results produced abnormal readings and were positive for pulmonary hypertension: however, plaintiff was not informed of said abnormal test results, was not formally diagnosed and there was no follow-up treatment, 38 U.S.C. 17.33(2), VA Directive 1088.

48. October 27, 2019, fellow entered a medical note stating, "Patient could be developing a component of pulmonary hypertension with chronically elevated post capillary pressures."

49. No follow-up RHC was performed, and plaintiff was not informed or given any follow-up treatment, 38 U.S.C. 17.33(2).

50. A pulmonary hypertension specialist was not utilized to care for Plaintiffs known

Original Complaint- Alex Madrid vs United States of America Negligence and Substandard of Care at Dallas Veterans Affair Medical Center 2017-2021.

terminal illness of pulmonary hypertension and instead Dallas VAMC negligently left plaintiffs' illness to go untreated for over 5 years, 38 U.S.C. 17.33(2).

## Count 4

### Negligence- Failure to Diagnose Pulmonary Fibrosis

51. The foregoing facts represent the professionally negligent actions of Dallas VAMC, Which actions proximately caused harm to Mr. Madrid.

52. November 5, 2015, June 7, 2017, October 10, 2017, October 16, 2017, November 11, 2019, and July 14, 2020, Dallas VAMC radiology examinations show significant abnormalities found in the lungs. Plaintiff was not informed of said abnormal test results, received no further examinations, diagnosis, or treatments. 38 U.S.C. 17.33(2), VA directive 1088. A pulmonary lung disease specialist was not utilized to care for plaintiff's known lung abnormalities which showed the manifestations of the terminal lung disease pulmonary fibrosis, 38 U.S.C. 17.33(2).

53. Listed radiology reports were not entered into the electronic medical record in a fashion a standard and reasonable person could understand.

54. Radiology abnormalities show symptoms of the lungs that represent pulmonary fibrosis such as: densities in skin tissue, linear opacities, mosaic attenuation, atelectasis and "Other unknown etiologies".

55. Mr. Madrid was not informed that after each procedure that the findings of dense tissue in the lungs were escalating, 38 U.S.C. 17.33(2), VA Directive 1088.

56. Informed consent were inadequately obtained by Dallas VAMC as the true nature and irregularities in radiology finding of the lungs were never revealed, 38 U.S.C. 17.31(d)(1), VA Handbook 1004.01(5).

10

Original Complaint- Alex Madrid vs United States of America Negligence and Substandard of Care at Dallas Veterans Affair Medical Center 2017-2021.

## IX. CAUSES OF ACTIONS

57. The wrongful acts and omissions of the Dallas VAMC have left Mr. Madrid with two terminal illnesses and a permanent loss of 30% of his lung function that cannot be reversed.

58. Due to the negligent procedural errors, by Dr. Phi Wiegn and Dallas VAMC on February 28, 2017, count 1, Mr. Madrid suffers from PVS in 3 of his 4 pulmonary veins.

59. The delay in treatment, count 2, of known PVS was too long in duration and caused plaintiff's upper lobe of the left lung to fibrose, eventually causing the lobe to lose function down to 2-3%. This eventually led to removal of the lobe and caused plaintiff to lose a permanent 30% lung capacity.

60. The failure to inform, count 3, Mr. Madrid of the positive findings for pulmonary hypertension allowed the terminal disease to go untreated, for approximately 5 years, and escalate from borderline pulmonary hypertension to advanced pulmonary hypertension, causing thickening of the heart and PVs. Mr. Madrid is now at a nonreversible high risk of heart failure at the young age of 40 years old.

61. Mr. Madrid's decision-making capacity of his treatment was taken from him as he was never informed, he had a terminal illness of pulmonary hypertension, count 3.

62. The delay in treatment of pulmonary hypertension, count 3, had significant outcomes on the, now advance, terminal disease and quality of life of Mr. Madrid and his family.

63. Portions of plaintiff's heart continued to thicken or enlarge, count 3, and could have been minimalized with proper treatment and care.

64. Mr. Madrid continued to teach and train in martial arts until he was forced to resign in January 2021. The pulmonary hypertension escalated into an advance stage, count 3, as he

11

Original Complaint- Alex Madrid vs United States of America
Negligence and Substandard of Care at Dallas Veterans Affair
Medical Center 2017-2021.

continued to exercise because it was unknown to him of the terminal illness that was advancing. Mr. Madrid was allowed to assist the disease in its progression by rigorous training in which RHCs show the advancement of capillary and PV pressure readings.

65. Signs of lung disease were seen as early as November 5, 2015. Due to the negligence of Dallas VAMC's failure to diagnose or treat plaintiffs scarring of the lungs, count 4, Scarring progressed until the upper lobe of his left lung completely fibrosed over and caused severe dyspnea, fatigue, loss of lung function and life-threatening hemoptysis.

66. Negligently failing to diagnose pulmonary fibrosis, count 4, and its symptoms caused the removal of plaintiff's left upper lobe and a permanent 30% loss of lung function.

67. The chronic total occlusion of PVS in the upper left PV was going to continue, however, count 4, no other medications or treatments were given as an alternate to plaintiff and could have been tried due to the stent continuing to fail.

68. A PV transplant or reconstructing the PV vein could have been attempted, count 4, and if successful, saved the pulmonary hypertension progression, fibrosis of the lung and saving the lobe and plaintiff's lung capacity.

69. If abnormalities of the lungs were properly examined or a pulmonologist was part of the treatment team, it could have been seen that the procedures, PVS, and chronic occlusion were severely scarring the upper left lobe, count 4. An alternate procedure could have been saved the lobe or a lobectomy could have been done sooner saving plaintiff numerous procedures. The fibrosis would not have spread with early detection and treatment.

70. Plaintiff is a martial arts enthusiast and proud teacher of the art for over fourteen years. This has been stripped away, due to Dallas VAMCs ongoing negligence, exercise induced

12

pulmonary hypertension, pulmonary fibrosis, pulmonary vein stenosis and permanent 30% loss of lung function, plaintiff is unable to exert energy to more than a basic walk.

71. Plaintiff was a Marine Corp Drill Instructor and professional full combat sports competitor. Plaintiff has had a very active lifestyle and at 40 years old can no longer exercise or exert energy due to fatigue, severe dyspnea, and dizziness that are caused by the terminal diseases.

72. Mr. Madrid must stay inside as weather fluctuates and the allergies affect him to where his breathing is affected and triggers unbearable panic attacks or episodes of severe anxiety.

73. Mr. Madrid's spouse is now on FMLA to care for him and to provide emotional support when his anxiety and panic attacks cause him to be unable to sustain daily life when an episode occurs, which is quite frequently.

74. Due to these diseases, plaintiff cannot play sports with his children, jog, lift weights, walk up and down stairs without assistance due to exercise induced pulmonary hypertension, fibrosis and loss of an organ with life-long loss of 30% lung capacity.

75. Mr. Madrid has coached his children's teams and had to remove himself from coaching as allergies from the sports fields cause him to suffer and be able to perform.

76. Prescribed medication for the loss of lung function has left plaintiff with side effect of the skin that has completely blemished and infected his entire back. He now needs assistance to was back with prescribed medication each time he showers and apply prescribed medication to entire back daily. Mr. Madrid is on a constant regiment of antibiotic mouth wash to control the constant infection of oral thrush due to side-effects of the same medication.

13

Original Complaint- Alex Madrid vs United States of America Negligence and Substandard of Care at Dallas Veterans Affair Medical Center 2017-2021.

77. Plaintiff need assistance with Activities of Daily Living: (1) walking up and down stairs, (2) walking long distances, (3) bathing entire back with prescribed medication and (4) grooming entire back twice a day with prescribed ointment.

## IX. Medical Records

78. All pertaining medical records have been submitted to Department of Veterans Affairs Evidence Intake Center in its entire capacity.

79. VA Torts Law Group has been given all pertaining medical records and/or has access to any and all medical records.

## X. Notice of Summons and Certificate of Service

80. A Notice of Summons will be properly served upon the Attorney General of the United States of America, United States Attorney for the Northern District of Texas and Department of Veterans Affairs Tort Law Group.

81. A certificate of service will be filed with the Dallas County District Clerk's Office upon completion.

## XI. Exhibits

82. Exhibit A- Updated SF-95 in accordance with 28 U.S.C. § 2675(b).

83. Exhibit B- Letter of acknowledgement of SF-95 by VA Torts Law Group

84. Exhibit C- Medical Expert Opinion Cardiac Electrophysiologist

85. Exhibit D- Medical Expert Opinion Pulmonologist

## XI. PRAYER FOR RELIEF

### Requested Relief

84. Plaintiff prays for special damages in the sum of $15,000,000.00.

14

Original Complaint- Alex Madrid vs United States of America Negligence and Substandard of Care at Dallas Veterans Affair Medical Center 2017-2021.

85. General damages according to proof.

86. Reasonable cost of suit.

87. Such other relief as the court may deem proper.

Respectfully submitted,                                    Dated: May 02, 2022

Alex Madrid
1804 Colorado Ct.
Burleson, TX 76028
(817) 201-6139

Original Complaint- Alex Madrid vs United States of America
Negligence and Substandard of Care at Dallas Veterans Affair
Medical Center 2017-2021.

15

# Exhibit

# A

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| Department of Veterans Affairs<br>Office of General Counsel, Tort Law Group<br>810 Vermont Ave, NW<br>Washington, DC 20420 | Alex Madrid<br>1804 Colorado Ct.<br>Burleson, TX 76028 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|---|
| ☒ MILITARY ☐ CIVILIAN | 09/04/1981 | Married | 02/28/2017 | Tuesday | 9:31 A.M. |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

Updated SF-95 for new and relevant medical information stating substandard of care from 2015-2021 at Dallas VAMC. Medical Opinion information shows procedure on Feb 28, 2017 at Dallas VAMC was performed without known mapping technique, prior imaging and numerous other factors that would lead to a safe and successful ablation. This update is to coincide with substandard of care for prompt treatment, failure to diagnose, treat or inform veteran. As a result, veteran is now terminal.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

None

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

None

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

Improper procedure caused pulmonary vein stenosis in 3 of 4 pulmonary veins. The narrowed veins and stent placement were not treated in a prompt manner aggravating or causing pulmonary hypertension, fibrosis and hemoptysis. Upper left lobe was removed, 3 stents placed in pulmonary veins, 3 procedure to clear occluded stents and 30% loss lung function for life.

| 11. | WITNESSES |
|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
| Michael Luna MD | 5201 Harry Hines Blvd, Dallas, TX 75235 |
| Kemp Kernstine MD | 5323 Harry Hines Blvd, Dallas, TX 75390 |
| Muhanned Abu-Hijleh MD | 5939 Harry Hines Blvd, Dallas, TX |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
| None | $15,000,000.00 | None | $15,000,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| | 817-201-6139 | 05/02/2022 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance?  ☒ Yes   If yes, give name and address of insurance company (Number, Street, City, and Zip Code) and policy number.  ☐ No

USAA Policy# 01781 84 44U
Accessibility Coordinator 9800, Fredericks burg Road. San Antonio, TX 78288.

| 16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?  ☐ Yes  ☒ No | 17. If deductible, state amount. |
| --- | --- |
| | $1,000/$1,000 |

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

None

19. Do you carry public liability and property damage insurance?  ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).  ☒ No

None

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident.  If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted.  Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations.  If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant.  A claim presented by an agent or legal representative must be presented in the name of the claimant.  If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

(a)  In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b)  In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c)  In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident.  Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d)  Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A.  **Authority:**  The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B.  *Principal Purpose:*  The information requested is to be used in evaluating claims.
C.  *Routine Use:*  See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D.  *Effect of Failure to Respond:*  Disclosure is voluntary.  However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501.  Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention:  Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC  20530 or to the Office of Management and Budget.  Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

# Exhibit

# B



**VA** | **U.S. Department of Veterans Affairs**
**Office of General Counsel**

Torts Law Group (021B)
810 Vermont Avenue, NW
Washington, DC 20420

In Reply Refer to GCL 487675

April 26, 2022

Alex Madrid
1804 Colorado Ct.
Burleson, TX 76028

RE: Administrative Tort Claim – Reassigned Investigator

Dear Mr. Madrid:

Please be advised the administrative tort claim the U.S. Department of Veterans
Affairs (VA) received on May 11, 2011, has been reassigned to a different investigator
whose details are provided below.

Attorney Jenny Mai
(202) 765-9083

A combination of federal and state laws governs FTCA claims; some state laws may
limit or bar a claim or lawsuit. VA staff handling FTCA claims work for the Federal
Government and cannot provide legal advice on state or federal law filing
requirements.

Sincerely,

*Jodi M. Willie*

Jodi M. Willie
Legal Assistant

# Exhibit

# C

**Rahul Jain, MD, MPH, FHRS**

**Cardiac Electrophysiologist, Assistant Professor**

**Indianapolis, Indiana**

RE: Alex Madrid

To Whom It May Concern,

Patient had atrial fibrillation ablation done on **02/28/2017** at Dallas VA Medical Center. On **07/06/2017** there is a note that mentions about his complain of shortness of breath and CT scan was ordered specifically to look for PV stenosis. He got a call about abnormal CT scan on 07/10/2017.

There is a period of 4.5 months before CT scan was ordered after the ablation. Was he not symptomatic in those 4.5 months? Was he seen in clinic for follow up after afib ablation by electrophysiologist who performed the procedure?

It seems CT scan had significant findings because of which he was given a call but then ultimately cath and stents were placed in PV on 08/10/2017, that's a month later. Why was there a delay of 1 month, though findings on CT scan seemed significant enough for them to call him and ask him come to ED. On **08/10/2017**: stents were not placed in LSPV/LUPV. Cardiac CT was recommended as outpatient to further interrogate the LUPV and interventional cardiologist mentioned, "will consider stenting of LSPV". The next CT scan was done on **10/16/2017**, followed by stenting of LSPV/LUPV on 12/22/2017. Cardiac CT was done 2 months later and LSPV stented more than 4 months after the first

angiography in someone where there was a doubt that LSPV might need intervention.

Fender et al in 2016, (Mayo clinic study) have clearly mentioned in their paper that

severely stenosed PV need **urgent intervention** otherwise complete occlusion can

happen. **The above-mentioned care amounts to delay in care and substandard care.**

Clinical notes from VA are all over the place. Symptoms of sob has been mentioned but then there is a note dated 03/25/2019 that says he didn't have any shortness of breath for 2 years post ablation. Improper documentation, wrong documentation is seen in many documents.

The EP procedure note (if this is the only one in electronic records then it is far **below the standard** in any EP lab): The note doesn't address the following questions: Was there any mapping system used? Was there any imaging study done prior to the procedure? How did the electrophysiologist define the anatomy of pulmonary veins? Did he do WACA or segmental isolation? How did he know he was not ablating at the PV ostium? The note mentions that 20 RF applications were given and these were 240-300 seconds long at 30-35 W. It means the dragging technique of ablation was performed. It is very important to well define the anatomy of Left atrium and pulmonary veins before doing continuous ablation for 4-5 mins. Samuel et al 2020 published the outcomes of ADVICE Trial looking into PV stenosis after atrial fibrillation. There was **no** patient who acquired severe PV stenosis post ablation in this multicenter trial. However, in this case RLPV, LIPV and LSPV all **three had severe stenosis** (as per cath report dated 08/10/2017). Therefore, the importance of a detailed EP report is essential in this case.

Involving pulmonary hypertension specialist would have been helpful in the management of the patients.

Any follow up studies done (like repeat CTA or VQ scan) post stenting to see for residual disease/stenosis. It seems these studies were only done when he was

again symptomatic. **Why were they not done post stenting to see for circulatory benefits/residual disease immediately post stenting?**

Notes have been signed months later by attending which might have resulted in in delay in care: Note written by cardiology fellow on 10/27/2019 but signed by attending on 02/13/2020: mentions about need for right heart cath because of patient's sob. If the fellow felt the shortness of breath was because of PHT then why right heart cath was not done. This is **delay in care amounting to substandard care.** Why PHT specialist never got involved in the care? Was he started on any medications to help with PHT? It seems ultimately angiography was done on 01/03/2020 not at VA Hospital but at UTSW (as per the brief summary provided with other documents for review).



# Exhibit

# D

James L. Pearle, MD
PO Box 157
Corona Del Mar, CA 92625

MEDICAL RECORD REVIEW

PATIENT NAME:  Alex Madrid
DATE OF BIRTH:  09/04/1981
DATE OF REPORT:  03/27/2022

Thank you for the opportunity to review records on Mr. Madrid.

My qualifications to opine on the case can be found in the attached CV.

A detailed medical chronology is attached.

DISCUSSION:

Mr. Madrid is a40-year-old male who had an ablation for atrial fibrillation on October 3, 2015. Following the ablation, his chest x-ray showed some atelectasis at the basis. En echocardiogram on January 24, 2016, showed left ventricular concentric remodeling with the suggestion of normal right atrial pressures.    On December 19, 2016, an EP consultation was obtained, where he is having recurrent palpitations. A Holter monitor was obtained. A transesophageal echocardiogram was done on February 28, 2018. On February 28, 2017, an electrophysiology study and pulmonary vein isolation were obtained.    On March 29, 2017, he was felt to have symptomatic TAF status post successful AF ablation. On May 4, 2017, an echocardiogram showed moderate eccentric left ventricular hypertrophy with an IVC dilated and a right atrial pressure of 15. July 7, 2017, a CT angiogram showed 50% stenosis of the right inferior pulmonary vein and high-grade stenosis versus short segment occlusion of the left inferior pulmonary vein. On July 10, 2017, Mr. Madrid reported shortness of breath and heart racing. He was admitted to the hospital.   A chest x-ray of July 10, 2017 showed no evidence of cardiopulmonary disease.  Pulmonary vein stenting was done on August 10, 2017.  A right heart catheterization was done.   A chest x-ray showed no acute findings.   On October 10, 2017, normal right upper lobe pulmonary vein was noted. On November 4, 2017, a right heart catheterization was done that showed severe diffuse stenosis of the LUPV with extensive collateralization and severe stenosis of the apical posterior venous branch with collateral draining of the left innominate vein and successful stenting.   On December 13, 2018, trouble breathing was described.  Again, dyspnea on exertion was

Alex Madrid
Page 2

noted on April 8, 2019.  On April 25, 2019, a right heart catheterization and angiography was done showing total occlusion of the left upper pulmonary venous stent and moderate in-stent stenosis of the left lower pulmonary vein and widely patent right lower pulmonary venous stent.  X-ray of April 29, 2019, showed clear lungs.  On October 25, 2019, Mr. Madrid complained of shortness of breath and chest pressure.

On November 27, 2019, CT angiogram of the heart showed redemonstration patent stents in the right LPV and LLPV and interval stenting of the LUPV.  Soft tissue findings were noted in the left perihilar region.  On November 27, 2019, CTA of the chest showed soft tissue in the left perihilar region with no grade change as well as thickening of the left upper lobe peribronchial bundle.  On July 24, 2020, mosaic attenuation, septal thickening and bronchial wall thickening in left upper lobe are most consistent with sequelae of prior history of left superior pulmonary vein occlusion.  On November 3, 2020, an emergency report reports heart racing and coughing up blood.  On December 21, 2020, he continued to have dyspnea on exertion.  On December 30, 2020, differential perfusion showed 28.76% to the left lung and 71.24% to the right lung.  On April 5, 2021, CT of the chest showed persistent septal thickening and scatted ground-glass opacities in left upper lobe, mildly improved.   On April 7, 2021, robotic left upper lobectomy was done with extensive adhesiolysis and ligation of pneumo-collateral veins.  On May 24, 2021, an x-ray of the chest showed stable left upper lobe densities.  On November 29, 2021, Mr. Madrid reports manageable shortness of breath.  Pulmonary function tests of January 20, 2022, reported restriction and moderate impairment, no bronchodilator response, reduced lung volumes obtained from restriction, and diffusing capacity mildly impaired.  A CT scan of January 20, 2022, showed persistent changes in left hemithorax consistent with prior left upper lobectomy.  Pulmonary function tests of December 21, 2020, showed diffusing capacity of 26%, minimally reduced TLC of 90% of predicted, and PFTs of January 20, 2022, showed a forced vital capacity of 68% of predicted and FEV1 of 68% of predicted, diffusing capacity of 68% of predicted and TLC of 60% of predicted.

DISCUSSION:  Medical records indicate the chronology of Mr. Madrid.  After cardiac ablations for atrial fibrillation, he subsequently developed pulmonary vein stenosis.  This is an uncommon but not unexpected complication of cardiac ablation.  Despite stenting of these pulmonary veins, circulation to Mr. Madrid's left upper lobe was significantly impaired leading to loss of perfusion, infiltrates, hemoptysis, and dyspnea.

An elective decision to remove the left upper lobe seemed to be an appropriate and necessary procedure because of the left upper lobe was clearly not going to improve and was likely to cause more trouble.

The residual of this is that Mr. Madrid has lost significant lung function.  His total lung capacity is only 60% of predicted.  He has lost some gas exchange capability with a loss

Alex Madrid
Page 3

of diffusing capacity as well.  This loss is permanent.  Mr. Madrid will never regain this lung function.

Fortunately, Mr. Madrid had sufficient pulmonary reserve to survive and function with a reasonable quality of life. However, this loss of pulmonary function will likely lead to permanent dyspnea and limitation on exercise.  Post-thoracotomy complications are often chest pain, shortness of breath, and cough, and these symptoms may not abate entirely.

The future for Mr. Madrid will almost certainly include chronic dyspnea and significant limitation on exercise performance, which is unfortunate given Mr. Madrid's occupation, which requires strenuous physical activity.

It is not the purview of this report to discuss the ablation procedures and the complications.   Electrophysiologist or other cardiologist can assess the chronology, appropriateness, or effectiveness of the procedures which Mr. Madrid underwent.

Mr. Madrid unfortunately has suffered an extremely unusual complication of cardiac ablation which has cost him 25% to 30% of his lung function and will probably cause chronic dyspnea and other respiratory symptoms in the future.

Mr. Madrid's pulmonary function is will likely not to change significantly unless other cardiac or pulmonary events occur.

Thank you for the opportunity to prepare this report.

My opinions are expressed to a reasonable degree of medical probability.

I reserve the right to alter or amend my opinion should additional information become available.


James L.Pearle, M.D.

JP/ng

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| ALEX MADRID | United States of America |

**(b)** County of Residence of First Listed Plaintiff **Johnson Co.**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Dallas Co.**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
ALEX MADRID, Pro Se
1804 Colorado Ct. Burleson, TX 76028

Attorneys *(If Known)*
Chad Meachem, US Attorney Northern District of Texas
Merrick Garland, Unites States Attorney General

MAY - 3 2022
MS
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

3-22CV0982-D

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & / [ ] 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' / Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 340 Marine / Injury Product | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 345 Marine Product Liability / Liability | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle / **PERSONAL PROPERTY** | [ ] 710 Fair Labor Standards Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle / [ ] 370 Other Fraud | [ ] 720 Labor/Management | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | Product Liability / [ ] 371 Truth in Lending | Relations | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 360 Other Personal / [ ] 380 Other Personal | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | |
| | Injury / Property Damage | [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| | [x] 362 Personal Injury - / [ ] 385 Property Damage | Leave Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| | Medical Malpractice / Product Liability | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | | [ ] 895 Freedom of Information Act |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights / **Habeas Corpus:** | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate | | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations / Sentence | | | [ ] 950 Constitutionality of State Statutes |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - / [ ] 530 General | | | |
| [ ] 290 All Other Real Property | Employment / [ ] 535 Death Penalty | **IMMIGRATION** | | |
| | [ ] 446 Amer. w/Disabilities - / **Other:** | [ ] 462 Naturalization Application | | |
| | Other / [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | [ ] 448 Education / [ ] 550 Civil Rights | | | |
| | / [ ] 555 Prison Condition | | | |
| | / [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
U.S.C. 17.32, U.S.C 17.33, VA Directive 1088, VA Handbook 1004.01(5)

Brief description of cause:
Negligence- failure to diagnose, inform, treat and delay in treatment causing loss of an organ and multiple terminal diseases

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
$15,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*
JUDGE _____  DOCKET NUMBER _____

DATE _____  SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____