IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALEX MADRID, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:22-CV-0982-D |
| VS. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

<u>MEMORANDUM OPINION</u>

In this action against defendant United States of America (the "government"), *pro se* plaintiff Alex Madrid ("Madrid") sues for medical malpractice under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), based on alleged substandard care that he received at the Dallas Veterans Affairs Medical Center and Fort Worth Outpatient Clinic (collectively, "VAMC," unless the context indicates otherwise). Following a bench trial, and for the reasons that follow,[1] the court finds that Madrid has failed to prove each of the essential elements of his malpractice claims and that the government is therefore entitled to judgment dismissing this action with prejudice.[2]

---

[1]The court sets out in this memorandum opinion its findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1). All factual findings are based upon a preponderance of the evidence, which means such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in the court's mind as the trier of fact a belief that what is sought to be proved is more likely true than not true. To prove a claim by a "preponderance of the evidence" merely means to prove that the claim is more likely so than not so.

[2]With court approval, the parties agreed that the exhibits admitted in evidence at trial be maintained under seal. The court has determined that its memorandum opinion need not

I

In October 2015, following a stroke, Madrid was diagnosed with atrial flutter. To treat this condition, Madrid underwent a radiofrequency ablation ("RFA") procedure. Prior to Madrid's first cardiac ablation procedure, he had mild to moderate concentric left ventricular hypertrophy with at least grade 1 diastolic dysfunction. About one year later, Madrid complained to the Dallas VA Medical Center about shortness of breath, and testing confirmed that he had atrial fibrillation ("A-Fib"). On February 28, 2017 Madrid underwent a second RFA procedure at VAMC to treat A-Fib.

On July 6, 2017, four months after his second ablation procedure, Madrid presented to VAMC complaining of shortness of breath. Radiology imaging performed on July 7, 2017 showed pulmonary vein stenosis ("PVS") and possible stasis/pulmonary vein thrombosis that was deemed "critical to patient care." P. Ex. 11 (capitalization omitted). Madrid was admitted to the VAMC Emergency Room on July 10, 2017, and a procedure to stent three pulmonary veins was scheduled for July 12, 2017. On July 11, however, Madrid self-discharged from VAMC against medical advice.[3]

On August 10, 2017 VAMC physician Houman Khalili, M.D. ("Dr. Khalili") performed a stent procedure in which he placed stents in Madrid's bilateral inferior pulmonary veins. On December 22, 2017 Dr. Khalili placed a stent in Madrid's left superior

─────────────────────

be sealed, but it will consider a request for sealing on timely motion for cause shown.

[3]Madrid maintains that this was the result of child-care issues that he encountered as a single father.

- 2 -

pulmonary vein ("LSPV").  In the months and years that followed, Madrid underwent numerous procedures, including a balloon angioplasty in April 2019 and an angiography and "stent in stent" replacement in June 2020, in an attempt to treat his PVS.

The interventions (including stenting and balloon angioplasty) have been successful in maintaining the patency of Madrid's left and right lower pulmonary veins.  The left upper pulmonary vein stenosis has been functionally different and more complicated since its initial presentation.  Multiple efforts to restore and maintain the patency of the left upper pulmonary vein were unsuccessful, leading to the loss of function of the left upper lobe.

Madrid was eventually referred to the University of Texas Southwestern Medical Center ("UTSW") through the Community Care Program.  In January 2021, after testing at UTSW verified that Madrid had pulmonary hypertension and fibrosis due to chronic total occlusion of the LSPV, his care team decided that he would be best served in the long term by having a left upper partial lobectomy, which was performed on April 7, 2021.  The elective procedure to remove the left upper lobe was appropriate and medically necessary.

To date, Madrid has not completed a cardiopulmonary exercise test.  The treatment of Madrid's atrial flutter and A-Fib was successful; Madrid has not experienced issues with A-Fib or atrial flutter since the ablation procedure in 2017.

Madrid filed this lawsuit on May 3, 2022.  In his second amended complaint, which is the operative pleading, he alleges claims under the FTCA for: delay in care of A-Fib (count 1); substandard care of A-Fib (count 2); delay in care of PVS (count 3); substandard care of PVS (count 4); failure to diagnose, treat, and inform pulmonary hypertension (count 5);

failure to diagnose, inform, and treat pulmonary fibrosis (count 6); and substandard medical records (count 7).

In *Madrid v. United States of America*, 2023 WL 8435244 (N.D. Tex. Dec. 5, 2023) (Fitzwater, J.), the court granted in part the government's cross-motion for summary judgment, dismissing Madrid's claims for delay in care of A-Fib (count 1), substandard care of A-Fib (count 2), and substandard medical records (count 7). *Id.* at *5, 12 n.21.[4] The remainder of the case (counts 3, 4, 5, and 6) then proceeded to a bench trial on March 28 and 29, 2024.

## II

The claims in this case are based on allegations that Madrid's treating physicians at VAMC were negligent in several respects. Liability for medical negligence "claims brought under the FTCA is determined by state law." *Coleman v. United States*, 912 F.3d 824, 829 (5th Cir. 2019) (citing *Ayers v. United States*, 750 F.2d 449, 452 n.1 (5th Cir. 1985)). Under Texas law,

> [w]hen the negligence alleged is in the nature of medical malpractice, the plaintiff has the burden of proving (1) a duty by the physician or hospital to act according to an applicable standard of care; (2) a breach of that standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury.

*Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003) (citing *Mills v. Angel*, 995

---

[4]The court also granted summary judgment in part on grounds that are not pertinent to today's decision, which follows a bench trial (e.g., that Madrid cannot recover more than the sum of $778,000 in damages).

S.W.2d 262, 267 (Tex. App. 1999, no pet.); *Denton Reg'l. Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950 (Tex. App. 1997, pet denied)).  "The plaintiff must establish the standard of care as a threshold issue before the factfinder may consider whether the defendant breached that standard of care to the extent it constituted negligence." *Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008).  "Unless th[e] standard of care is common knowledge or within the experience of laymen, testimony from a medical expert is required to satisfy the plaintiff's threshold burden of proof." *Coleman*, 912 F.3d at 829 (citing *Hannah*, 523 F.3d at 601). "That testimony must focus on the standard of care in the community in which the treatment took place or in similar communities." *Quijano*, 325 F.3d at 568 (citations omitted).  "In other words, subject to [a] narrow exception . . . a plaintiff must produce expert testimony to prove the applicable standard of care, a breach of that standard, and a causal connection between the breach and the harm suffered in medical malpractice cases." *Woods v. U.S. Gov't*, 2010 WL 809601, at *3 (N.D. Tex. Feb. 4, 2010) (Ramirez, J.) (citing *Hannah*, 523 F.3d at 601-02; *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005)), *rec. adopted*, 2010 WL 809601, at *1 (N.D. Tex. Mar. 8, 2010) (Fitzwater, C.J.), *aff'd*, 2011 WL 857007 (5th Cir. Mar. 11, 2011).

### III

At trial, Madrid and the government presented the testimony of competing expert witnesses.

Plaintiff's expert, Dianne L. Zwicke, M.D., F.A.C.C. ("Dr. Zwicke"), holds medical licenses in internal medicine and cardiology.  She practiced for 42 years at Aurora

Health Care, St. Luke's Medical Center, Milwaukee, Wisconsin before retiring during the COVID-19 pandemic.  At St. Luke's Medical Center, Dr. Zwicke worked in clinical cardiology and served as Medical Director of the Pulmonary Arterial Hypertension Clinic.  She also served as a Clinical Adjunct Professor of Medicine at the University of Wisconsin School of Medicine and Public Health.  She currently spends half of her time practicing cardiology telemedicine and the other half doing legal consulting.[5]

Defendant's expert, Harold Palevsky, M.D. ("Dr. Palevsky), currently serves as the Chief of Pulmonary Allergy and Critical Care and the Director of Pulmonary Vascular Disease Program at Penn Presbyterian Medical Center, which is one of the core teaching hospitals of the University of Pennsylvania health system.  He has been a Professor of Medicine at the University of Pennsylvania School of Medicine since 1984. Dr. Palevsky also practices in Philadelphia as a pulmonary critical care physician.  He is board certified in internal medicine, pulmonary medicine, and critical care medicine.

IV

The court turns first to Madrid's claim for substandard care of PVS (count 4), which is based primarily on the allegation that the 7 millimeter stent that Dr. Khalili placed in

---

[5]Dr. Zwicke's claim to have been one of the six physicians in the United States who helped establish the field of pulmonary hypertension was effectively impeached by the testimony of the government's expert witness, Harold Palevsky, M.D.

Madrid's LSPV on December 22, 2017 was too small.[6]

A

At trial, Madrid's expert witness, Dr. Zwicke, testified that a 7 millimeter stent is "small," given the size of the LSPV, and "actually promotes stenosis." Tr. 1:51.[7] She also testified, however, that using a smaller stent is "standard" procedure, *id.* at 53, and that stents ranging in size from 6 to 10 millimeters would be "reasonable," depending on the physical anatomy of the patient's veins, *id.* at 113. Regarding stent placement, Dr. Zwicke explained that when a smaller stent is used, the physician must make sure that it "opposes the wall circumferentially[;] otherwise, it will start occluding immediately after it's been placed." *Id.* at 54. Because Madrid experienced restenosis in his LSPV, Dr. Zwicke opined that "the stents weren't placed correctly." *Id.* at 88; *see also id.* at 89 (Dr. Zwicke opining that "some of the stents that were placed in [Madrid's] lungs, plural, were not placed appropriately and did cause damage.").

Dr. Palevsky, the government's expert witness, also testified that the range in stent size for a pulmonary vein is from 6 millimeters to 10 millimeters. He explained that "what you put in is what you feel fits and you can get in to alleviate stenosis[, a]nd under that

---

[6]In support of his substandard care of PVS claim (count 4), Madrid also alleges that "[i]mmediate and ongoing imaging should have taken place immediately following stent placement on December 22, 2017, however it did not," Am. Compl. ¶ 126, and that "Defendant allowed the [LSPV] to remain chronically and totally occluded," *id.* ¶ 127. Because these allegations relate to Madrid's claim for delay in care of PVS (count 5), the court will address them below, *see infra* at § V, in the context of that claim.

[7]Citations to the trial transcript are to the volume and page of a preliminary draft that is subject to revision by the official court reporter before it is filed on the docket.

circumstance 7 would be pretty standard." *Id.* at 173-74; *see also id.* at 176 (Dr. Palevsky testifying that a 7 millimeter stent is "within the range of reasonable."). Dr. Palevsky disagreed with Dr. Zwicke's opinion that there was an error in the placement of Madrid's LSPV stent on December 22, 2017. Instead, he opined that Madrid likely experienced restenosis as a result of his body's natural biological response to the stent (i.e., scarring). He explained that approximately 25% of patients who have stents placed for PVS experience restenosis; that "that's just the reality of the world," *id.* at 174; and that "no amount of first line high quality medical treatment guarantees a positive outcome" when stents are used to treat PVS, *id.* at 175.

B

Madrid has not proved by a preponderance of the evidence that Dr. Khalili breached the standard of care when he placed a 7 millimeter stent in Madrid's LSPV.

First, both experts agree that it is standard procedure to use a stent ranging in size from 6 millimeters to 10 millimeters in the LSPV and that, based on the individual patient's anatomy, the use of a 7 millimeter stent is reasonable.

Second, Madrid has failed to produce any evidence, other than Dr. Zwicke's unsubstantiated opinion, that Dr. Khalili did not properly place the stent on December 22, 2017. Dr. Zwicke opines, based solely on the fact that Madrid experienced restenosis, that "some of the stents that were placed in [Madrid's] lungs . . . were not placed appropriately and did cause damage." *Id.* at 89. But she fails to support her opinion with any evidence. Negligence cannot be "imputed from an unsatisfactory outcome." *Bustos v. United States*,

- 8 -

2021 WL 1192154, at *5 (N.D. Tex. Mar. 30, 2021) (Pittman, J.) (citing *Hunter v. Robison*, 488 S.W.2d 555, 560 (Tex. Civ. App. 1978, writ ref'd n.r.e.); *Thomas v. Beckering*, 391 S.W. 2d 771, 775 (Tex. Civ. App. 1965, writ ref'd n.r.e.)).

In contrast, the court gives greater weight to Dr. Palevsky's testimony, which is based on his experience and on studies published in reputable medical journals, that restenosis is common when stents are used to treat PVS, even in the absence of medical negligence, and that restenosis is not caused by the stent's size in relation to the vein, but, instead, by the body's natural biological reaction to the stent itself. The court gives less weight to Dr. Zwicke's speculative and unsupported opinion that the stent was not placed correctly. It finds that Dr. Palevsky's testimony is both credible and more reliable than Dr. Zwicke's, and it is persuaded by Dr. Palevsky's expert opinion that neither the size of the stent nor the stent's placement on December 22, 2017 caused the restenosis in Madrid's LSPV.

The court finds that Madrid has failed to prove by a preponderance of the evidence that Dr. Khalili breached the standard of care when he placed the 7 millimeter stent in Madrid's LSPV on December 22, 2017.

V

The court next considers Madrid's claim for delay in care of PVS (count 3).

A

Madrid alleges that VAMC delayed in the care of his PVS by, *inter alia*, the following acts and omissions:

(1) failing to perform post-RFA radiology imaging until four months after his

- 9 -

February 28, 2017 RFA;

(2) diagnosing him with PVS on July 7, 2017, but waiting until August 10, 2017 to perform the procedure to place stents;

(3) failing to perform post-stenting imaging to check for PVS and other cardiopulmonary circulatory abnormalities until two months after the August 2017 stent placement;

(4) placing a stent in Madrid's LSPV approximately six months after it was found to be completely stenosed;

(5) failing to perform immediate and ongoing imaging following the stent placement on December 22, 2017;

(6) failing to perform radiology imaging during 2018 to evaluate Madrid's symptoms;

(7) postponing Madrid's April 8, 2019 surgery until April 25, 2019; and

(8) ordering a two-month follow-up with cardiology on October 25, 2019, even though Madrid had a totally occluded LSPV stent that had already been occluded for one and a half months.

B

As set out above, to prevail on a medical malpractice claim under Texas law, a plaintiff must prove four elements; (1) a duty by the physician or hospital to act according to an applicable standard of care; (2) a breach of that standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. *Quijano*, 325 F.3d at 567 (citing *Mills*, 995 S.W.2d at 267). The court finds that Madrid has failed to prove either the

- 10 -

breach or the causation element of his claim based on delay in care of PVS.

1

Madrid did not prove that VAMC breached the standard of care when it waited until four months after his February 28, 2017 RFA to perform imaging, waited 35 days after diagnosing him with PVS to perform the first procedure to place stents, or waited an additional four months to place stents in Madrid's LSPV.

Dr. Zwicke testified at trial that the one month delay in July/August 2017 between the diagnosis of PVS and the first procedure to place stents "would fall into a category of delay in care because this is a significant vascular issue." Tr. 1:31. She opined that "[w]e don't wait and delay with vascular issues. We immediately send you to the emergency room, an urgent visit at an office with the appropriate physician or being directly admitted for further evaluation" because "when any form of clotted blood or tissue starts to clog something there's usually no turning back if you don't treat it right away because it just adheres there and adheres itself to the wall." *Id.* In discussing the delay in stenting Madrid's LSPV, Dr. Zwicke opined that "five months between delaying the procedure for further evaluation to actually performing the procedure of a known occluded pulmonary vein . . . is absolutely delay in care. That is a critical abnormality, a critical . . . pathology in the lung and the longer it goes the less chance you have of improving anything." *Id.* at 50-51. And she opined that the delay from February 21, 2019 until April 28, 2019 "from a diagnosis of a thrombus vein to a procedure being scheduled, would . . . be considered delay in care of treating the thrombus vein." *Id.* at 57-58.

- 11 -

In contrast, the government's expert, Dr. Palevsky, testified that Madrid received "appropriate treatment from the VA of his [PVS]." *Id.* at 168; *see also* P. Ex. 38 (Dr. Palevsky's declaration, stating defendant's "treatment of Mr. Madrid's [PVS] did not depart from the standard of care. . . . [T]he subsequent management of [PVS] has been attentive and appropriate."). Although Dr. Palevsky acknowledged that "we can always in retrospect say we should have done some things faster," he opined that "there's no knowledge base that points to that." Tr. 1:168. Regarding the appropriate timing for post-RFA imaging, Dr. Palevsky testified that the recommendation is three to six months, explaining that there are sound medical reasons for delaying post-RFA imaging. *Id.* at 169 ("You don't want to take the CAT scan when the swelling is present . . . [and you] don't want to do repeated studies in individuals because of the radiation."). When questioned about the timing for *treatment* of PVS, Dr. Palevsky testified that "there's no defined standard of care to date." *Id.* at 177; *see also id.* ("What is recommended is when you've identified a problem sooner rather than later is preferable, but we can't say that if there's an extra two weeks, or an extra four weeks, or an extra 12 weeks that that's going to change the outcome in any way. There is no data that anybody can provide that shows that."). He opined, based on the standard of care in 2017, that it was "absolutely" reasonable to place Madrid's initial stents within 35 days of his PVS diagnosis. *Id.* Regarding the interval between Madrid's initial stenting procedure and the second stenting procedure, Dr. Palevsky testified that there is no standard of care in the medical literature or in his medical experience and that there was no reason to believe "that the outcome in this case would have been different if the plaintiff's treatment of that

third upper pulmonary vein had been faster." *Id.* at 178.

The court finds that Dr. Palevsky's testimony is both credible and reliable, and it is persuaded by his opinion that Madrid's physicians at VAMC did not breach any standard of care in the timing of Madrid's post-RFA imaging or the two procedures to stent his stenosed pulmonary veins.

2

Even if Madrid *did* prove that his physicians at VAMC breached the standard of care when they delayed imaging studies or procedures related to his PVS, he has failed to prove that any of the alleged delays proximately caused his injuries.

"It has long been the law in Texas that a plaintiff in a medical negligence case must 'prove by a preponderance of the evidence that the allegedly negligent act or omission was a proximate cause of the harm alleged.'" *Guile*, 422 F.3d at 225 (citing *Archer v. Warren*, 118 S.W.3d 779, 782 (Tex. App. 2003, no pet.); *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995); *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399-400 (Tex. 1993); *Bowles v. Bourdon*, 219 S.W.2d 779, 782 (Tex. 1949)). "For the alleged negligence to be a proximate cause of the harm, the harm must have been a foreseeable result of the negligence, and the negligence must have been 'a substantial factor in bringing about the harm, and without which the harm would not have occurred.'" *Id.* (citations omitted). "Because medical treatment is beyond the reach of a layperson's knowledge and experience, expert evidence is required to show both a breach of a standard of care and that the breach was a proximate cause of the harm suffered." *Id.* (citing *Chambers v. Conaway*, 883 S.W.2d

- 13 -

156, 158 (Tex. 1993); *Bowles*, 219 S.W.2d at 782-83); *see also Pediatrics Cool Care v. Thompson*, 649 S.W.3d 152, 161 (Tex. 2022) ("To prove that medical negligence proximately caused an injury or death requires expert testimony.").

At trial, Dr. Zwicke testified that Madrid's damages, i.e., the loss of a portion of his lung, were caused by VAMC's delay in care. *See* Tr. 1:88 (Dr. Zwicke testifying that "VAMC continuously delay[ed] the care of plaintiff's [PVS]," and that Madrid's "damages [were] caused by that, the delay in care.").[8] But this conclusory opinion on causation is not supported by any methodology, research, or reference to Madrid's medical records.

As the Supreme Court of Texas recently explained:

> An expert's scientific testimony must be grounded in the methods and procedures of science. Otherwise, the testimony is no more than subjective belief or unsupported speculation. Thus, an expert's bare assertions about causation do not suffice. Nor can the expert rely on "magic language" to establish that the testimony is based on reasonable medical probability instead of possibility, speculation, or surmise. If the record contains no evidence supporting an expert's material factual assumptions, or if such assumptions are contrary to conclusively proven facts, opinion testimony founded on those assumptions is not competent evidence. Finally, when the evidence demonstrates other plausible causes of an injury, the expert must exclude those other causes with reasonable certainty.

*Pediatrics Cool Care*, 649 S.W.3d at 161 (footnotes, some internal quotation marks, citations, and brackets omitted).

_____

[8]The court confines its analysis to the testimony and evidence introduced at trial and does not consider Dr. Zwicke's expert reports, which were neither offered nor admitted into evidence at trial.

Dr. Zwicke testified, as a general matter, that "[w]e don't wait and delay with vascular issues.  We immediately send you to the emergency room, an urgent visit at an office with the appropriate physician or being directly admitted for further evaluation" because "when any form of clotted blood or tissue starts to clog something there's usually no turning back if you don't treat it right away because it just adheres there and adheres itself to the wall." Tr. 1:31.  But she failed to provide any evidence in support of her speculative conclusion that the delay in care in *this case* caused Madrid's damages (i.e., the loss of a portion of his lung). "The mere possibility that an act of negligence *might* have been the proximate cause of damages from a medical viewpoint is not sufficient to support recovery." *Arlington Mem'l Hosp. Found., Inc. v. Baird*, 991 S.W.2d 918, 923 (Tex. App. 1999, pet. denied) (citation omitted); *see also Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988) ("In a medical malpractice case, . . . the plaintiff must establish a causal connection beyond the point of conjecture; proof of mere possibilities will not support the submission of an issue to the jury.").  And "20/20 hindsight analysis which does not provide a factual basis for evidence of negligence in the standard of care . . . or any evidence of causation . . . does not support a finding of medial malpractice." *Moreno v. M.V.*, 169 S.W.3d 416, 422-23 (Tex. App. 2005, no pet.) (citation omitted).

Nor did Dr. Zwicke by her trial testimony refute Dr. Palevsky's expert opinion testimony that the outcome in this case would not have been any different "if the plaintiff's treatment of that third upper pulmonary vein had been faster," Tr. 1:178; *see also id.* at 207 (Dr. Palevsky testifying, "[w]ould I prefer when we make the diagnosis of [PVS] to do our

best to intervene quickly?  Absolutely.  Do I have any evidence that having waited an extra four weeks, eight weeks, 12 weeks makes ultimately any difference in the course or outcome?  There's no data."), or that Madrid's damages were caused by the PVS itself, not by any delay in the treatment of the PVS, *see id.* at 210 ("The [PVS], the compromise of blood flow to that lobe of the lung is what caused all of those downstream effects . . . [a]nd what was happening in that left upper lobe was a consequence of that occlusion.").

Accordingly, because Madrid has failed to meet his burden of proof with respect to the breach or causation element of his claim based on the delay in care of his PVS, the court finds and concludes that the government is entitled to dismissal of the claim asserted in count 3.

VI

Madrid alleges in count 5 that VAMC committed medical malpractice when his physicians failed to diagnose, treat, and inform him regarding pulmonary hypertension (sometimes referred to in this memorandum opinion as "PH").

A

Dr. Palevsky testified at trial that the term "pulmonary hypertension" refers to high blood pressure within the pulmonary vascular bed.  He explained that there are two types of pulmonary hypertension that are relevant to this case: group one PH and group two PH. According to Dr. Palevsky's testimony, group one PH, also known as pulmonary arterial hypertension, occurs in the small vessels (pre-capillary) in the lungs, and is treated by a pulmonary hypertension specialist, who will typically prescribe one of 16 approved

- 16 -

medications for group one PH. In contrast, group two PH, formerly known as pulmonary venous hypertension, occurs when the left side of the heart does not function properly, causing blood to back up in the pulmonary veins into the pulmonary capillaries. Dr. Palevsky testified that group two PH is commonly managed by a heart failure cardiologist and that treatment options include the use of diuretics or beta blockers.

Dr. Zwicke opined at trial that Madrid's physicians at VAMC failed to diagnose and treat his pulmonary hypertension, that Madrid should have been referred to a pulmonary hypertension specialist, and that if they had "decided to treat, that could have altered the outcome." Tr. 1:90. On cross examination, however, Dr. Zwicke acknowledged that she did not know whether Madrid required pulmonary hypertension medication. And she admitted that in 99.9% of cases, only group one PH can be treated with medications; that group two PH is caused by left heart disease; that, prior to the 2017 RFA, Madrid had left ventricular hypertrophy and diastolic dysfunction, both of which are types of left heart disease known to cause group two PH; that for pulmonary hypertension caused by left heart disease, i.e., group two PH, the treatment is to treat the left heart disease; that Madrid had "minimal evidence of pulmonary arterial hypertension," *id*. at 107; and that "because [Madrid] did not have pulmonary arterial hypertension, the type of hypertension that can be treated with medication under the supervision of a specialist . . . [Madrid] should not have been prescribed medications for pulmonary hypertension," *id.* at 109.

- 17 -

B

The court finds that Madrid has failed to establish that the physicians at VAMC breached the standard of care with respect to the diagnosis and treatment of his pulmonary hypertension. Both expert witnesses in this case agreed that Madrid's medical records show that he had group two PH. Dr. Palevsky persuasively testified that group two PH is usually managed by a cardiologist, and both experts agreed that, in almost all cases, group two PH is *not* treated with any of the 16 approved hypertension medications. When asked to characterize the care of Madrid's pulmonary hypertension second to left ventricular hypertrophy, Dr. Palevsky responded: "[h]e's on metoprolol, which is standard therapy for diastolic dysfunction, and I think that the care has been appropriate." *Id*. at 184. Madrid failed to come forward with any evidence to refute this opinion or otherwise to demonstrate that his physicians at VAMC breached the standard of care with respect to the diagnosis and treatment of his pulmonary hypertension.

C

Madrid also alleges in count 5 that various imaging studies and other procedures indicated signs of pulmonary hypertension as early as March 4, 2017, but that he was not informed of these findings or formally diagnosed with pulmonary hypertension until July 12, 2021. At trial, Dr. Zwicke opined that Madrid's physicians at VAMC breached the standard of care because, between March 29, 2019 and December 29, 2020, they failed to inform him that there was a suspected diagnosis of pulmonary hypertension.

Assuming *arguendo* that Madrid's care team at VAMC *did* breach the standard of care

in failing to inform Madrid about the various findings that indicated that he had pulmonary hypertension, the court finds that Madrid has failed to meet his burden of proof with respect to count 5 because he has not introduced any evidence that enables the court as trier of fact to find that the failure to inform him regarding pulmonary hypertension caused any damages. The court has already found that Madrid's group two PH was properly managed by Madrid's physicians. *See supra* at § VI(B). Madrid has not introduced any evidence that persuades the court that the outcome in this case or the damages Madrid suffered would have been any different had his physicians informed him earlier that they had observed signs of pulmonary hypertension. *See, e.g.*, *Methodist Hosp. v. German*, 369 S.W.3d 333, 348-49 (Tex. App. 2011, pet. denied) (reversing finding of medical negligence where "there is no evidence establishing a reasonable medical probability that the course of [plaintiff]'s treatment was influenced by any failure by nurses to communicate information to physicians.").

VII

Finally, Madrid alleges in count 6 a claim for failure to diagnose, inform, and treat pulmonary fibrosis.[9]

As stated above, it is clearly established under Texas law that "a plaintiff must produce expert testimony to prove the applicable standard of care, a breach of that standard, and a causal connection between the breach and the harm suffered in medical malpractice

---

[9]Dr. Palevsky opined in his trial testimony that Madrid did not have pulmonary fibrosis. The court will assume that he did since it does not change the outcome of the court's decision on count 6.

cases." *Woods*, 2010 WL 809601, at *3 (citing *Hannah*, 523 F.3d at 601-02; *Guile*, 422 F.3d at 225). Madrid has not met this burden. Madrid has failed to prove through expert testimony that his physicians at VAMC breached the standard of care by failing to diagnose, inform, or treat pulmonary fibrosis.

Dr. Palevsky testified at trial that pulmonary fibrosis has "[no] relevance" to the care that Madrid received at VAMC because "[i]t's not a condition that he has. It's not been seen on any of the CAT scans. The pulmonary function studies that he had before his surgery clearly show there's no suggestion of that." Tr. 1:163. Madrid's only expert witness, Dr. Zwicke, did not provide any testimony at trial that refuted Dr. Palevsky's expert opinion. Nor did she give expert testimony that established the standard of care with respect to the diagnosis or treatment of pulmonary fibrosis. In fact, the only testimony that Dr. Zwicke provided regarding pulmonary fibrosis was in response to the question whether, "[i]f [Madrid's] care was done different would this type of causation happen?" Tr. 1:85, to which Dr. Zwicke responded: "I don't have a good explanation why your entire left lobe collapsed other than it was damaged sufficiently." *Id*.

Regarding the alleged failure to inform Madrid regarding pulmonary fibrosis, the court finds that Madrid has also failed to prove this claim by a preponderance of the evidence. As with Madrid's claim for failure to inform regarding pulmonary hypertension, Madrid has not provided any evidence that the outcome in this case or the damages he suffered would have been any different had his physicians informed him earlier that they had observed signs of pulmonary fibrosis. *See, e.g.*, *Methodist Hosp.*, 369 S.W.3d at 348-49.

Accordingly, the court finds in the government's favor on this claim.

VIII

To the extent that the court has not made a specific finding of fact or conclusion of law regarding one or more of Madrid's claims, the court finds and concludes that he has failed to prove all of the essential elements of that claim by a preponderance of the evidence.[10]

*   *   *

For the reasons explained, the court finds that Madrid has failed to prove his medical malpractice claims by a preponderance of the evidence, and, by separate judgment entered today, dismisses this action with prejudice.

April 30, 2024.

SIDNEY A. FITZWATER
SENIOR JUDGE

---

[10]Because the court finds that Madrid has failed to prove his remaining claims, it does not need to address whether the government proved its limitations defense.